UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROSALINDA M.,<br>　　　　Plaintiff,<br><br>　　v.<br><br>ANDREW SAUL,<br>Commissioner of Social Security,<br>　　　　Defendant. | Case No. 18-cv-07648-JSC<br><br>**ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 23, 28 |

Plaintiff Rosalinda M. seeks social security benefits for physical and mental impairments, including osteoarthritis and high blood pressure. (Administrative Record ("AR") 126.) Pursuant to 42 U.S.C. Section 405(g), Plaintiff filed this lawsuit for judicial review of the final decision by the Commissioner of Social Security ("Commissioner") denying her benefits claim. Now before the Court are Plaintiff's and Defendant's Motions for Summary Judgment.[1] (Dkt. Nos. 23 & 28.) Because the Administrative Law Judge's ("ALJ's") consideration of the medical opinion evidence constitutes reversible error, the Court GRANTS Plaintiff's motion, DENIES Defendant's cross-motion, and REMANDS for further proceedings.

**LEGAL STANDARD**

A claimant is considered "disabled" under the Social Security Act if she meets two requirements. *See* 42 U.S.C. § 423(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). First, the claimant must demonstrate "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

---

[1] Both parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 13 & 14.)

than 12 months." 42 U.S.C. § 423(d)(1)(A). Second, the impairment or impairments must be severe enough that she is unable to do her previous work and cannot, based on her age, education, and work experience "engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). To determine whether a claimant is disabled, an ALJ is required to employ a five-step sequential analysis, examining: (1) whether the claimant is "doing substantial gainful activity"; (2) whether the claimant has a "severe medically determinable physical or mental impairment" or combination of impairments that has lasted for more than 12 months; (3) whether the impairment "meets or equals" one of the listings in the regulations; (4) whether, given the claimant's "residual functional capacity," ("RFC") the claimant can still do her "past relevant work"; and (5) whether the claimant "can make an adjustment to other work." *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012); *see also* 20 C.F.R. §§ 404.1520(a), 416.920(a).

An ALJ's "decision to deny benefits will only be disturbed if it is not supported by substantial evidence or it is based on legal error." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (internal quotation marks and citation omitted). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks and citation omitted). "Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Id.* In other words, if the record "can reasonably support either affirming or reversing, the reviewing court may not substitute its judgment for that of the Commissioner." *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 523 (9th Cir. 2014) (internal quotation marks and citation omitted). However, "a decision supported by substantial evidence will still be set aside if the ALJ does not apply proper legal standards." *Id.*

## BACKGROUND

### I. Procedural Background

On August 18, 2015, Plaintiff filed an application for social security disability benefits, alleging disability beginning July 30, 2015. (AR 23.) The Commissioner first denied the application on December 14, 2015, (AR 163), and again denied the application upon ALJ. (AR 178.) On July 10, 2017, Plaintiff appeared and testified before ALJ Cheryl Tompkin. (AR 106.)

2

Ruth Van Vleet, a vocational expert ("VE"), also testified during the hearing. (AR 115.)

On January 19, 2018, the ALJ issued an unfavorable decision. (AR 20-36.) Two months later, Plaintiff filed a request for review of the ALJ's decision. (AR 224-26.) In November 2018, the Appeals Council determined that it would not review the ALJ's findings, making the ALJ's decision final. (AR 1-9.)

## II. Administrative Record

Plaintiff was born on May 9, 1961 and resides in Antioch, California. (AR 126.) She asserts that she has been unable to work since July 30, 2015 because of "severe arthritis and fibromyalgia." (Dkt. No. 23 at 7; *see also* AR 405.)

### A. Medical Evaluations and Physician Statements

#### 1. Physical Examination by Dr. Calvin Pon

Dr. Calvin Pon is a consultative examining orthopedic physician who met with Plaintiff on May 6, 2013. (AR 343.) Dr. Pon's report notes that Plaintiff's chief complaints were "bilateral hand pain, left knee pain, right knee pain, and bilateral ankle and foot pain." (*Id.*) Dr. Pon's report includes the following diagnoses: (1) "chronic bilateral hand pain secondary to degenerative arthritis;" (2) history of three operations to the left knee with "chronic residual left knee pain, probable degenerative arthritis;" (3) history of three to four operations to the right knee with "chronic residual right knee pain, probable degenerative arthritis;" and (4) "chronic bilateral ankle and foot pain, probable degenerative changes, possible musculoligamentous/soft tissue pain, or a combination of these." (AR 345.)

Dr. Pon's "functional capacity assessment" opined that Plaintiff can stand and walk approximately four hours and sit six hours out of an eight-hour workday. (*Id.*) Further, Plaintiff can carry "frequently 10 lbs. and occasionally up to 20 lbs." (*Id.*) There is "no functional impairment with her ability to perform fine manipulative tasks" with her right hand even though there "might be some symptomatic limitations," and Plaintiff is "very functional" in performing fine manipulative tasks with her left hand. (*Id.*) She has "no restriction in stooping" and can rarely to occasionally "perform limited crouching, kneeling and squatting." (*Id.*) Dr. Pon opined that Plaintiff can "take public transportation." (AR 346.)

### 2. Physical Examinations and Statement from Rheumatologist Dr. Zuzana U. Foster

Dr. Zuzana U. Foster is Plaintiff's treating rheumatologist. (AR 405.) Dr. Foster reported that she had treated Plaintiff since October 2009 and saw Plaintiff "every 2-6 months." (*Id.*) Dr. Foster met with Plaintiff on October 29, 2015 for complaints of "ongoing pain in joints and muscles," "stiffness," and "chronic symptoms of fatigue." (AR 385.) Per the report, Plaintiff's history of present illness includes osteoarthritis, fibromyalgia, back pain, and drug monitoring. (*Id.*) Dr. Foster conducted a physical examination and found "[osteoarthritis] changes hands; no overt synovitis; hand joint deformities present; tender large muscle groups; tender and swollen right dorsal foot." (AR 386.)

Dr. Foster met with Plaintiff again on November 12, 2015 for complaints of continuing "pain in the knees, hands, muscles." (AR 382.) The report notes that Plaintiff "is tolerating meds but is only taking [M]otrin and needs a cortisone injection." (*Id.*) Dr. Foster conducted a musculoskeletal physical exam and found "[osteoarthritis] changes hands; crepitus knees; no synovitis; tender shoulders with limited ROM; [bilateral sacroiliac joint pain]." (AR 383.) Dr. Foster administered a "right sacroiliac joint injection" and noted that Plaintiff should "return in 2-3 months, sooner if needed," and "continue [her] current regimen" of taking ibuprofen and using Lidoderm adhesive patches in addition to various high blood pressure medications. (AR 384.)

Dr. Foster examined Plaintiff on January 20, 2016 for a complaint of "pain in the hands." (AR 378.) Plaintiff reported fatigue, back pain, joint pain, and myalgia. (AR 379.) In pertinent part, Dr. Foster diagnosed Plaintiff with "[o]ther intervertebral disc degeneration" in the "lumbar region" and "lumbosacral region," "[p]ain in [an] unspecified ankle and joints of [an] unspecified foot," and "[p]rimary generalized (osteo)arthritis." (AR 379-80.)

In a January 2016 "Arthritis Medical Source Statement," Dr. Foster diagnosed Plaintiff with "generalized osteoarthritis" and indicated that it was a "chronic lifelong condition." (*Id.*) Dr. Foster indicated that Plaintiff's reported symptoms include chronic joint pain, stiffness, muscle pain, fatigue, and sleep disturbance. (*Id.*) Dr. Foster further found that Plaintiff experiences pain in the "hands, neck, back, feet . . . worse with activity/use; severe pain at times 8-10/10." (*Id.*)

4

Dr. Foster reported that Plaintiff is not required to use an assistive device while "engaging in occasional standing/walking." (AR 407.) Dr. Foster indicated that Plaintiff could stand/walk for less than two hours total in an eight-hour work-day, and that she would need unscheduled breaks "every 10-30 minutes" during a work-day. (AR 406.) Further, Plaintiff can rarely lift less than ten pounds and never lift more than ten pounds. (AR 407.) Dr. Foster also reported that Plaintiff has "significant limitations with reaching, handling or fingering." (*Id.*) Dr. Foster opined that Plaintiff's symptoms would likely interfere with her "attention and concentration needed to perform even simple work tasks" for at least 25% of a typical work-day. (*Id.*) Dr. Foster further opined that Plaintiff is "incapable of [tolerating] even 'low stress' work," and Plaintiff would likely miss more than four days of her work per month due to her "impairments or treatment." (*Id.*)

### 3. Physical Examination by Dr. Satish K. Sharma

Dr. Satish K. Sharma is a consultative examining physician who met with Plaintiff on November 5, 2015. (AR 372.) Dr. Sharma's report notes Plaintiff's chief complaints were "low back pain; joint pain; hypertension; obesity; high cholesterol." (*Id.*) Dr. Sharma's report includes the following diagnoses: (1) low back pain secondary to musculoskeletal strain; (2) joint pain secondary to osteoarthritis; (3) obesity; (4) hypertension; and (5) high cholesterol. (AR 374.) Dr. Sharma noted that Plaintiff walks with a limp on the left lower extremity and "could not do toe walking and heel walking" but she did not require an assistive device to walk. (*Id.*) Dr. Sharma reported that Plaintiff has swelling in the interphalangeal joints of the fingers in both hands and has no tenderness to palpitation and full range of motion in the finger joints. (AR 373.) Dr. Sharma indicated that Plaintiff has tenderness to palpitation in both knees and no evidence of patellar instability. (*Id.*) Further, Plaintiff has tenderness to palpitation "over the lumbar spine and in the paravertebral region" of her back. (AR 374.) Dr. Sharma opined that the "straight leg raising" test was negative and did not note any muscle spasms. (*Id.*)

Dr. Sharma's "functional assessment / medical source statement" opined that Plaintiff can stand, walk, and sit six hours cumulatively out of an eight-hour workday with appropriate breaks. (*Id.*) Further, Plaintiff can carry "50 pounds occasionally and 25 pounds frequently." (*Id.*) She

has "no limitation" for the "use of the hands for fine and gross manipulative movements," and can occasionally bend and stoop. (*Id.*)

### 4. Non-Examining State Agency Physicians

In December 2015, a non-examining state agency physician reviewed Plaintiff's medical records and determined that while Plaintiff's impairments cause some limitations on her ability to perform work activities, those limitations do not prevent her from performing her past relevant work as an "administrative assistant." (AR 133.) Thus, the state agency physician concluded that Plaintiff can "perform light work activity." (AR 134.) Another state agency physician made the same determination upon reconsideration of Plaintiff's application in March 2016. (*See* AR 146.)

## B. ALJ Hearing

### 1. Plaintiff's Testimony

Plaintiff reported past work as an administrative assistant for two years from 2013 to 2015. (AR 106-07.) Before that, Plaintiff worked "as a backup" in the trauma unit at John Muir Medical Center where she helped "set up tables on an emergency basis." (*Id.*) Both jobs required frequent use of hands "and lifting and typing." (AR 107.)

While working at John Muir, on "about three different occasions being in a hurry and [her] grip not being good," she dropped sterile packs which caused the staff to "stop the surgeries" and "go back and get new equipment." (AR 106.) Further, this was "time-consuming and also [a] danger to the patients." (*Id.*) After the third occasion, Dr. Foster suggested that Plaintiff should retire because her hands "weren't going to get any better or any stronger and they couldn't do any more surgeries on [her] hands." (*Id.*) Plaintiff "went ahead at the advice of human resources" and was "kind of forced to retire" from her role. (*Id.*)

Plaintiff is a fall risk because she has lost "most of the muscle mass" in her legs. (AR 108.) Plaintiff no longer has balance "in [her] legs and [her] knee" and the "arthritis in there has separated [her] kneecaps." (AR 108.) Plaintiff gets "shooting pains" in her fingers when she "grab[s] things" and "personal care at times [is] difficult." (AR 108-09.) She "just has to stop what [she is] doing because it hurts so bad." (*Id.*) Plaintiff's treatment includes hip injections and "Norco to help [her] sleep." (AR 109-10.) Plaintiff previously received an injection "up to

6

[every] six months" but now "it [the injection] only lasts about four to five" months.  (AR 109.)  The injections help her "do things a little easier" but they "don't alleviate the pain." (AR 109-10.)  Plaintiff is "always, very tired" and she has to "sit down at least three or four times in between doing any little tasks."  (AR 110.)

Plaintiff does not sleep well when the pain is "really intense" and she "[has] to take Norco to help [her] sleep" but "all it does is make [her] groggy."  (*Id.*)  The ALJ asked Plaintiff how often she takes Norco to treat her pain.  (AR 111.)  Plaintiff takes Norco "probably about three times per week" depending on the "weather."  (AR 112.)  During the winter, she takes Norco "probably every night, sometimes during the day."  (*Id.*)

When Plaintiff's counsel asked Plaintiff if she was "suffering from any depression," Plaintiff testified she "[doesn't] feel like a complete person anymore" because she can no longer do "eighty percent of what [she] used to do . . . and it makes her really sad when [she] sees everybody get up and go to work in the morning and [she] just [has] to stay home because [she is] not used to that" as Plaintiff "worked all [her] life."  (AR 111-12.)   On an average day Plaintiff wakes up and stays upstairs "probably until two or three in the afternoon" and then goes downstairs to "kind of wait around" to see her husband or one of her adult children arrive at home.  (AR 112-13.)  The ALJ asked Plaintiff if she spends her day watching TV.  (AR 113.)  Plaintiff does not "even hardly do that" and does not "do much of anything."  (*Id.*)  Plaintiff  "likes to look at [her] pictures" and she "sleep[s] a lot."  (AR 114.)  She is "scared" and does not "want to go anywhere by [her]self" because she trips easily.  (AR 113-14.)  The ALJ then asked Plaintiff if she uses a cane or a similar device.  (AR 114.)  Plaintiff responded that she has a walker at home but does not use it because she is only "cautious about" walking up and down the stairs in her house.  (*Id.*)

### 2. Vocational Expert's Testimony

Vocational expert Ruth Van Vleet classified Plaintiff's recent relevant work history as follows: department secretary at a hospital as "sedentary;" and administrative assistant as "sedentary."  (AR 116-17.)  Ms. Van Vleet testified that Plaintiff's role as department secretary as "sedentary" because Plaintiff indicated in the work history form that she lifted less than ten

7

pounds when retrieving items for surgeries and the emergency department. (AR 117.) The ALJ posited the following hypothetical to Ms. Van Vleet regarding both roles:

> Assume an individual of claimant's age, education and work experience who is able to perform work at the light exertion level. The individual can lift or carry 20 pounds occasionally and 10 pounds frequently. The individual can sit, stand or walk for six hours in an eight hour work day. The individual can occasionally climb ramps and stairs and never climb ladders, ropes or scaffolds. The individual can frequently balance and occasionally stoop, kneel, crouch or crawl. The individual can frequently but not constantly handle and finger bilaterally. The individual should avoid concentrated exposure to extreme cold and work place hazards such as unprotected heights and moving machinery. Can an individual with these limitations perform claimant's past work as claimant performed it or as customarily performed?

(AR 117-18.) Ms. Van Vleet responded that the individual could do so per the Dictionary of Occupational Titles. (AR 118.) The ALJ posited a second hypothetical to Ms. Van Vleet:

> [A]ssume the same facts as in hypothetical one except the individual would be able to stand or walk for four hours and could stoop or crouch rarely to occasionally and rarely is defined as two point five hours or less. The individual could push or pull bilaterally with the upper extremity, occasionally to frequently and could push or pull frequently with the lower extremity. The individual could frequently finger and feel bilaterally. So can an individual with these limitations perform claimant's past work as claimant performed it or as customarily performed?

(AR 118-19.) Ms. Van Vleet responded that the individual could not do so. (AR 119.) The ALJ asked Ms. Van Vleet if there were "any transferable skills under this hypothetical." (*Id.*) Ms. Van Vleet responded that Plaintiff's transferable skills included: "answer[ing] her phone;" "deal[ing] with the public;" "customer service;" and "us[ing] a computer." (*Id.*) Ms. Van Vleet indicated that based on the second hypothetical, these skills transfer to the following roles: receptionist, telephone solicitor, and information clerk. (AR 119-20.) The ALJ posited a third hypothetical to Ms. Van Vleet:

> [A]ssum[ing] the facts as in hypothetical two except the individual would be able to stand or walk for 30 minutes at a time for a total of four hours and would need to rest, let's say for three minutes after walking 30 minutes and the individual is able to sit for . . . six hours in an eight hour work day but would need the option to shift positions by standing or sitting at a work station while remaining on task and she would need to do that every hour and add that additional limitation that the individual would be off task let's say seven perfect of the work day due to pain or other conditions. So, can an individual with

8

|   |   |
|---|---|
| 1 | these limitations perform claimant's past work as claimant performed it or as customarily performed? |

(AR 120.) Ms. Van Vleet responded that an individual could perform Plaintiff's past work and as customarily performed, but "not as Plaintiff defined [the work] in her work history form" because the Dictionary of Occupational Titles does not "address the option of shifting and standing or being off task." (AR 120-21.)

### C. ALJ's Decision

On January 19, 2018, the ALJ issued a written decision denying Plaintiff's application and finding that Plaintiff was not disabled within the meaning of the Social Security Act based on the testimony, evidence, and the Social Security Administration's five-step sequential evaluation process for determining disability. (AR 24.)

At step one, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since July 30, 2015, the alleged onset date, through her date of last insured, which is June 30, 2019. (AR 24.)

At step two, the ALJ concluded that the objective medical evidence indicated that Plaintiff's "osteoarthritis of the bilateral hands, feet, knees, and back; obesity; fibromyalgia" constitute severe impairments. (AR 25 (citing 20 C.F.R. § 404.1520(c)).) The ALJ also considered evidence of Plaintiff's treatment for "high blood pressure and high cholesterol" and Plaintiff's "history of high blood pressure for over ten years." (AR 26.) The ALJ determined that Plaintiff's high blood pressure and high cholesterol were non-severe because the "evidence does not demonstrate that these impairments cause more than a minimal impact on [Plaintiff's] ability to perform basic work activities." (*Id.*)

As to Plaintiff's claimed depression, the ALJ found that "the record as a whole does not establish the presence of a medically determinable mental impairment." (*Id.*) The ALJ noted that Plaintiff "did not allege depression in her application for disability benefits, but endorsed symptoms of depression at the hearing." (*Id.*) The ALJ determined that "apart from a prior (2013) consultative psychological examination, the record contains no evidence that the [Plaintiff] has

9

sought or received mental health treatment, or that she has reported related complaints." (*Id.*)[2] Further, the ALJ noted that "throughout the period at issue, clinicians regularly reported unremarkable mental status observations, including appropriate mood and affect, good insight, and good judgment." (*Id.*)

At the third step, the ALJ concluded that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (AR 26 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).) The ALJ reached this conclusion by evaluating the severity of Plaintiff's impairments "under listings 1.02 (major joint dysfunction) and 1.04 (disorders of the spine, the listings most applicable in this case." (*Id.*) The ALJ considered fibromyalgia and obesity "in combination with [Plaintiff's] co-existing impairments" even though "fibromyalgia and obesity are not listed impairments." (*Id.*) The ALJ concluded that the "medical evidence does not establish nerve root compromise or the requisite sensory, motor, or reflex loss identified in listing 1.04." (*Id.*) The ALJ further concluded that the "record does not show sufficient demonstration of an inability to ambulate effectively or to perform fine and gross movements effectively as defined in section 1.00B2 and required of listing 1.02." (*Id.*)

Before reaching step four, the ALJ considered Plaintiff's RFC and determined that Plaintiff "has the residual functional capacity to perform light work" as defined under 20 C.F.R. § 404.1567(b) with the following exceptions:

> [Plaintiff] can stand or walk for 4 hours in an 8-hour day, and sit for 6 hours. She can occasionally climb ramps or stairs, but never ladders, ropes, or scaffolds. She can frequently balance, and can occasionally kneel and crawl. She can stoop or crouch rarely (defined as 2.5 hours or fewer in an 8-hour day). She can push or pull bilaterally with the upper extremities occasionally to frequently, and can push or pull frequently with the lower extremities. She can frequently handle, finger, and feel bilaterally. She must avoid concentrated exposure to extreme cold and to workplace hazards such as moving machinery and unprotected heights.

---

[2] Dr. April Young, a consultative examining psychologist, examined Plaintiff on April 10, 2013 (over two years prior to the disability onset date) and diagnosed Plaintiff with an "Adjustment Disorder with Depressed Mood" and ruled out "Mood Disorder due to Pain." (*See* AR 338-39.)

10

(AR 26.)

In making her RFC determination, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to produce the . . . alleged symptoms; however, [Plaintiff's] statements considering the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence or other evidence in the record." (AR 28.) The ALJ cited in support of her determination the objective medical evidence, Plaintiff's treatment history and subjective symptoms reported to treatment providers, and Plaintiff's "capacity for a wide range of light work." (AR 28-30.)

As for the medical opinion evidence, the ALJ afforded "significant weight to the opinions of DDS medical consultants, who found [Plaintiff] capable of light work," noting that "their assessment is largely reflected in the [RFC determination]." (AR 30.) The ALJ afforded "partial weight" to Dr. Sharma's opinion, noting that "while Dr. Sharma's assessment is generally consistent with his examination findings at the time," the "weight of the evidence . . . supports the greater limitations identified in [the RFC determination]." (*Id.*) The ALJ also noted that Dr. Sharma "did not observe evidence of patellar instability or significant hand dysfunction" during the examination, but the ALJ "considered evidence of prior remote surgeries on [Plaintiff's] hands and knees" and "[Plaintiff's] testimony that she was previously issued a handicap placard, in assessing her overall functioning." (*Id.*)

The ALJ afforded "some, but limited weight" to Dr. Calvin Pon's physical examination. (AR 30.) The ALJ determined that "Dr. Pon's clinical findings do not vary significantly from those of Dr. Sharma or from clinician observations during the relevant period, and generally demonstrate that [Plaintiff's] functioning has remained stable," but "Dr. Pon's examination was performed over two years prior to the alleged disability onset date." (*Id.*) The ALJ noted that "Dr. Pon's assessment is also generally consistent with [Plaintiff's RFC]." (*Id.*)

The ALJ also assigned "limited weight" to Dr. Foster's opinion that Plaintiff is "limited to a significantly reduced range of sedentary work, including the inability to perform even low stress work, and the need to miss more than four days of work per month." (AR 29.) The ALJ noted that Dr. Foster "wrote a letter at [Plaintiff's] request to take her off work for three months as of

11

July 30, 2015 (the alleged disability onset date), and opine[d] that [Plaintiff] is not able to work due to "severe, disabling" osteoarthritis chiefly affecting her hands;" yet, the "accompanying contemporaneous treatment records do not evidence clinical findings or significant changes in [Plaintiff's] course of treatment to support such extreme limitations." (AR 29.) Further, the ALJ noted that Dr. Foster's opinion "regarding [Plaintiff's] inability to work appears to rely heavily on the claimant's reported symptoms and complaints with specific regard to her most recent job." (*Id.*) In sum, the ALJ determined "after careful consideration of the entire evidentiary file and hearing testimony," that Plaintiff's RFC assessment "is supported by the weight of the evidence." (AR 30.)

At step four, the ALJ cited the vocational expert's hearing testimony and concluded that Plaintiff "cannot perform her past relevant work, either as actually performed or as generally performed in the national economy." (*Id.* (citing 20 C.F.R. § 404.1565).)

At step five, the ALJ determined that Plaintiff "had acquired work skills from past relevant work" as an administrative assistant and department secretary "that are transferable to other occupations with jobs existing in significant numbers in the national economy." (AR 31 (citing 20 C.F.R. §§ 404.1568(d), 404.1569(a)).) The ALJ thus determined that Plaintiff "has not been under a disability, as defined in the Social Security Act, from July 30, 2015, through the date of this decision." (*Id.* (citing 20 C.F.R. § 404.1520(f)).)

**DISCUSSION**

Plaintiff asserts that the ALJ committed reversible error by failing to: (1) appropriately weigh the medical opinion evidence in addressing Plaintiff's fibromyalgia; (2) address Plaintiff's "mental illness"; (3) consider Plaintiff's "pain in accordance with Social Security Ruling 16-3P"; and (4) "meet her burden of proof at step five by using the medical vocational profiles." (Dkt. No. 23 at 13-22.) The Court agrees that the ALJ committed reversible error in weighing the medical opinion evidence to assess Plaintiff's fibromyalgia; further, that error is related to Plaintiff's additional arguments because it affected the ALJ's analysis of Plaintiff's subjective symptom testimony and the step-five finding based on the vocational expert's testimony. Plaintiff's argument regarding the ALJ's weighing of the medical opinion evidence is thus dispositive and

12

1  the Court need not address the additional arguments.

## I. ALJ's Consideration of Medical Opinion Evidence

### A. Legal Standard

In the Ninth Circuit, courts must "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (as amended (Apr. 9, 1996)). "A treating physician's opinion is entitled to more weight than that of an examining physician, and an examining physician's opinion is entitled to more weight than that of a nonexamining physician." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007). If a treating physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991). "The opinion of an examining [physician], even if contradicted by another [physician], can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record," and the ALJ "must provide "clear and convincing" reasons for rejecting an uncontradicted opinion of an examining physician. *Lester*, 81 F.3d at 830-31.

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the opinion is still "entitled to deference." *Orn*, 495 F.3d at 633 (internal citation omitted). To determine the amount of deference, the ALJ must consider the following factors in determining the weight to give to all medical opinions: (1) examining relationship; (2) treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors brought to the ALJ's attention. 20 C.F.R. § 416.927(c)(5). "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Id.* at 831.

"When an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, [she] errs." *Garrison v. Colvin*, 759 F.3d 995, 1012-13 (9th Cir. 2014) (internal citation omitted). Namely, an ALJ errs by "reject[ing] a medical opinion or assign[ing] it little weight while doing nothing more than ignoring it, asserting

13

1  without explanation that another medical opinion is more persuasive, or criticizing it with
2  boilerplate language that fails to offer a substantive basis for [her] conclusion." *Id.* "The ALJ can
3  meet [her] burden by setting out a detailed and thorough summary of the facts and conflicting
4  medical evidence, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799
5  F.2d 1403, 1407 (9th Cir. 1986). Ultimately, "the ALJ must do more than offer [her] conclusions.
6  [She] must set forth his own interpretations and explain why they, rather than the doctors', are
7  correct." *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988).

### B. The ALJ's Analysis

Plaintiff insists that in assessing the severity of Plaintiff's functional limitations the ALJ "committed legal error [in] giving little weight" to the opinion of her "treating rheumatologist," Dr. Foster, and greater weight to the opinion of Dr. Satish K. Sharma, a "non-treating non-specialist." (Dkt. No. 23 at 13-14.) The ALJ gave "limited weight" to treating rheumatologist Dr. Foster's assessment because the "contemporaneous treatment records" did not show "clinical findings or significant changes in [Plaintiff's] course of treatment to support such extreme limitations" such as a "reduced range of sedentary work." (AR 29 (citing AR 380, 390).) The ALJ observed that Dr. Foster's opinion "appears to rely heavily on [Plaintiff's] reported symptoms and complaints with specific regard to her most recent job." (*Id.*) Plaintiff contends that the ALJ's reasons for giving little weight to the opinion of Dr. Foster are neither specific nor legitimate and are not supported by substantial evidence in the record.

First, there are clinical findings to support the treatment records. The ALJ does not reference the clinical findings of physicians Dr. Basel Kashlan, Dr. Umesh Gheewala, Dr. Daniel Lively, Dr. Mark Allan Smith, or Dr. Lawrence W. Chan regarding Plaintiff's fibromyalgia and osteoarthritis anywhere in her decision. Dr. Kashlan completed a blood test report for Plaintiff on June 14, 2017 and reported a positive value of Antinuclear Antibodies ("ANA"), which is "suggestive of autoimmune disease and reflexes to titer and pattern." (AR 41-42.)[3]

---

[3] ANA tests identify the presence of autoantibodies, which can signal the existence of autoimmune disease, such as rheumatoid arthritis. *See Antinuclear Antibodies*, WebMD, https://www.webmd.com/a-to-z-guides/what-is-an-antinuclear-antibody-test#1 (last visited March 6, 2020). Plaintiff asserts that this positive test result is "indicative of the body's system break

14

Dr. Gheewala examined Plaintiff on June 20, 2017 for a follow up appointment regarding her arthritis and complaints of "pain in [her] hands [and] fingers." (AR 62.) Dr. Gheewala conducted a physical examination of Plaintiff and diagnosed her with osteoarthritis which was "likely erosive [osteoarthritis] . . . [m]ostly in both fingers and [bilateral] [k]nees." (AR 65.)

Dr. Lively conducted a physical examination on January 11, 2018 and found "decreased range of motion, swelling, effusion, laceration, abnormal patellar mobility and bony tenderness" in the left knee and "medial joint line, lateral joint like and patellar tendon tenderness." (AR 72.) Dr. Lively endorsed the pain medication needed for Plaintiff's chronic osteoarthritis and ordered the "labs and imaging studies" requested by Plaintiff. (*Id.*)[4]

Dr. Smith examined Plaintiff on January 25, 2018 for complaints of "[bilateral] knee pain for years markedly worse in left knee one month after hearing feeling a pop" and noted Plaintiff's "[history] of surgery for patellar instability [bilateral] . . . with surgical intervention over 30 years ago." (AR 82-83.) Dr. Smith ordered an x-ray and diagnosed Plaintiff with "chronic knee instability, unspecified laterality" and "chronic pain of both knees." (*Id.*)

Dr. Chan conducted an x-ray of Plaintiff's knee on January 29, 2018 and determined that Plaintiff had "severe patellofemoral compartment osteoarthritis bilaterally; mild left joint effusion; and calcium pyrophosphate deposition disease." (AR 98.) The ALJ does not acknowledge the aforementioned findings which document Plaintiff's ongoing pain associated with her fibromyalgia. "[T]here are no laboratory tests to confirm the diagnosis [of fibromyalgia]"; instead, fibromyalgia is "diagnosed entirely on the basis of patients' reports of pain and other symptoms." *Benecke v. Barnhart*, 379 F.3d 587, 590 (9th Cir. 2004). Further, the ALJ does not address whether the clinical findings provide support for Dr. Foster's treatment records and thus fails to provide a valid reason based on substantial evidence in the record to ascribe limited weight to Dr. Foster's opinion. *Benecke*, 379 F.3d at 594 (finding that an ALJ's "[s]heer disbelief is no substitute for substantial evidence" where "[Plaintiff] consistently reported severe fibromyalgia

---

down causing breaks in the joint[s] and cartilage." (Dkt. No. 23 at 15.)
[4] Plaintiff called and requested an appointment because she "need[ed] x-ray order on her left knee still on [sic] pain." A Patient Coordinator scheduled the appointment because Plaintiff "was seen by Dr. Lively on January 11, 2018 and [the] medication didn't work." (AR 79.)

15

symptoms both before and after diagnosis, and much of her medical record substantially pre-dates her disability application"). Although these clinical findings generally post-date Dr. Foster's opinion, much of the record supports Plaintiff's fibromyalgia diagnosis and the ALJ must weigh Dr. Foster's opinion in consideration of "the record as a whole." *See Batson v. Comm'r Soc. Sec.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (ALJ may discredit treating-physician opinion that is "conclusory, brief, and unsupported by the record as a whole, . . . or by objective medical findings"); 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

Second, changes in the course of treatment for fibromyalgia are not indicative of the degree and severity of the disease and thus do not serve as a valid basis for rejecting Dr. Foster's opinion. The ALJ discounts the severity of Plaintiff's fibromyalgia because the record "largely consists of periodic and routine office visits to administer cortisone injections . . . with little variation in the frequency or in the extent of treatment." (AR 28.) The ALJ's suggestion that a change in frequency and method of treatment by Dr. Foster would better support Plaintiff's "reports of longstanding arthritic pain" is entirely speculative. (*Id.*) "Conservative treatment is a legitimate reason for an ALJ to discredit a claimant's testimony regarding the severity of an impairment." *Trejo v. Berryhill*, No. EDCV-17-0879-JPR, 2018 WL 3602380, at *4 (C.D. Cal. July 25, 2018) (citing *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007)). However, "[a] claimant 'cannot be discredited for failing to pursue non-conservative treatment options where none exist.'" *Id.* (quoting *Lapeirre-Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010)). Here, the ALJ cites evidence that Dr. Foster made referrals for imaging studies and physical therapy, "[but] no such studies or therapy records are available [in the record]." (AR 28.) However, the ALJ did not identify any other viable, more invasive treatment options that Dr. Foster could have implemented to better address Plaintiff's fibromyalgia.

Moreover, "[a]ny evaluation of the aggressiveness of a treatment regimen must take into account the condition being treated." *Revels v. Berryhill*, 874 F.3d 648, 667 (9th Cir. 2017). A course of treatment for fibromyalgia consisting of a variety of prescription medications and steroid injections is not conservative. *Id.* "Fibromyalgia is treated with medications and self-care, rather

16

than surgery or other more radical options." *Trejo*, 2018 WL 3602380, at *15 (internal quotation marks and citation omitted). There is substantial evidence in the record that Plaintiff actively sought and received such treatment from Dr. Foster for her fibromyalgia symptoms. (*See* AR 387, 388 (noting Plaintiff's ongoing treatment of ibuprofen and Lidoderm adhesive patches); 384 (noting administration of cortisone injection in right sacroiliac joint in addition to ongoing treatment); 380 (noting addition of Medrol, Norco, and Pennsaid to ongoing treatment).) Thus, the ALJ does not provide a specific nor legitimate reason to give limited weight to Dr. Foster's opinion as to the intensity, persistence, and limiting effects of Plaintiff's fibromyalgia.

Further, the ALJ's opinion improperly disregards the length and nature of Dr. Foster's extensive treatment relationship with Plaintiff and does not offer a legitimate reason for doing so. *See Trevizo v. Berryhill*, 871 F.3d 664, 676 (9th Cir. 2017) (finding reversible error in failing to "consider factors such as the length of the treatment relationship, the frequency of examination, [and] the nature and extent of treatment relationship") (citing 20 C.F.R. § 404.1527(c)(2)-(6)).

The ALJ also erred in ascribing more weight to consultative examiner Dr. Sharma than to treating rheumatologist Dr. Foster without providing specific and legitimate reasons supported by substantial evidence for doing so. The ALJ assigned greater weight to Dr. Sharma's opinion because his "assessment [was] generally consistent with his examination findings at the time." (AR 29.) The ALJ notes that Dr. Sharma and Dr. Foster each examined Plaintiff during the same month in 2015 but only Dr. Foster observed tenderness in Plaintiff's hands and shoulders. (AR 29 ("Dr. Foster noted bilateral shoulder tenderness with limited range of motion" whereas "in the same month . . . Dr. Sharma did not report shoulder tenderness or range of motion loss, and noted full (5/5) upper extremity strength.") (citing AR 373, 383).) The ALJ does not explain how she chose to resolve the conflict between the assessments in Dr. Sharma's favor beyond a circular reference to the consistency of Dr. Sharma's assessment with his sole physical examination of Plaintiff. (*See* AR 29.) The ALJ's treatment of the medical opinion evidence is particularly concerning given that she fails to acknowledge that Dr. Sharma conducted his examination without Plaintiff's medical records. (*See* AR 372.)

Further, Dr. Sharma's opinion does not address Plaintiff's fibromyalgia. (*See* AR 25, 374.)

17

"Rheumatology is the relevant specialty for fibromyalgia" and such "[s]pecialized knowledge may be particularly important with respect to a disease such as fibromyalgia." *See Benecke*, 379 F.3d at 594 n.4. Here, as Plaintiff's treating rheumatologist, Dr. Foster is better suited to address and assess Plaintiff's pain and tenderness associated with fibromyalgia; Dr. Sharma is a consultative examining physician who as an internist (AR 375) lacks the specialization required to accurately assess the pain and severity of Plaintiff's conditions. Because Dr. Foster's medical opinion contradicted Dr. Sharma's medical opinion as to Plaintiff's functional limitations, the ALJ was required to "summarize[ ] the facts and conflicting clinical evidence in detailed and thorough fashion, stating [her] interpretation and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989). The ALJ briefly summarizes the conflicting nature of Dr. Foster's and Dr. Sharma's opinions but does not cite substantial evidence in the record to support her summary. (*See* AR 28-29.) The ALJ was required to analyze the disparate opinions regarding the degree, severity, and associated pain of Plaintiff's physical impairments rather than reject Dr. Foster's opinion solely because it was inconsistent with Dr. Sharma's opinion. In sum, in ascribing more weight to the opinion of Dr. Sharma with inadequate explanation, the ALJ fails to identify substantial evidence in the record to support her decision.

The ALJ's failure to resolve the conflict among medical opinions regarding the severity of Plaintiff's conditions as they relate to her functional limitations infected the ALJ's analysis at other steps. Thus, the ALJ's error was not harmless because it was not "inconsequential to the ultimate nondisability determination." *Molina*, 674 F.3d at 1115 (internal quotation marks and citation omitted); *see also McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011) (noting that remand is appropriate "where the circumstances of the case show a substantial likelihood of prejudice" to the party claiming error); *Cunningham v. Colvin*, No. C-10-4313-LB, 2014 WL 4965028, at *9 (N.D. Cal. Oct. 3, 2014) (finding reversible error in discrediting treating physician's medical opinion on basis of lack of objective evidence regarding Plaintiff's pain).

//

//

**II.     Remand or Credit-As-True**

1    Plaintiff asks the Court to reverse the ALJ's decision and remand "for payment of
2 benefits" because her "testimony is consistent with the medical record" and her "treating
3 Specialist Dr. Foster's evaluation [that] she is disabled is uncontroverted." (Dkt. No. 23 at 22.)
4 Alternatively, Plaintiff asks the Court to reverse the ALJ's decision and remand for further
5 administrative proceedings. (Dkt. No. 23 at 22-23.)

When a court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Benecke*, 379 F.3d at 595. A remand for an award of benefits is proper, however, "where (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Revels*, 874 F.3d at 668 (internal quotation marks and citation omitted).

Here, there are outstanding issues that must be resolved before a final disability determination can be made because the ALJ's failure to properly consider the medical opinion evidence when assessing Plaintiff's RFC affected the subsequent analysis at steps four and five. Thus, the Court cannot conclude on this record that the ALJ would be required to find Plaintiff disabled. Accordingly, on remand the ALJ must appropriately analyze the impairments and limitations caused by Plaintiff's fibromyalgia and osteoarthritis—regardless of severity—at subsequent steps of the sequential evaluation and reassess the weighing of all medical opinion evidence.

**CONCLUSION**

For the reasons stated above, the Court GRANTS Plaintiff's motion, DENIES Defendant's cross-motion, and REMANDS for further proceedings.

This Order disposes of Docket Nos. 23 and 28.

//

//

//

19

**IT IS SO ORDERED.**

Dated: April 1, 2020

                                                                                             */s/ Jacqueline Scott Corley*
                                                                                             JACQUELINE SCOTT CORLEY
                                                                                             United States Magistrate Judge